**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 13-cv-00502-MSK

**YVONNE MONTOYA,**

   **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,**

   **Defendant.**

---

### OPINION and ORDER

---

  **THIS MATTER** comes before the Court on Plaintiff  Yvonne Montoya's appeal of the

Commissioner of Social Security's final decision denying her application for Disability

Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and

Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-

83c.  Having considered the pleadings and the record, the Court

  **FINDS** and **CONCLUDES**

**I.**  **Jurisdiction**

  Ms. Montoya filed a claim for disability insurance benefits pursuant to Titles II and XVI,

asserting that her disability began on March 20, 2009.  After her claim was initially denied, Ms.

Montoya filed a written request for a hearing before an Administrative Law Judge ("ALJ").  This

request was granted and a hearing was held on August 31, 2011.

  The ALJ issued a decision which found that Ms. Montoya met the insured status

requirements through December 31, 2012.  Applying the five-step disability evaluation process,

the ALJ also found that: (1) Ms. Montoya had not engaged in substantial gainful activity since March 20, 2009; (2) she had the following severe impairments: degenerative disk disease, left ankle pain, chronic left knee pain with arthritis, left hip pain with foot drop and major depressive disorder secondary to a general medical condition; (3) she did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, Appx. 1 ("the Listings"); and (4) Ms. Montoya had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567 and 416.967[1] with the following additional limitations: unskilled work with an SVP of one or two; lifting and carrying less than ten pounds frequently and ten pounds occasionally; standing or walking a total of four hours in an eight hour workday with the use of a cane; sitting (with normal breaks) a total of more than six hours in an eight hour workday; pushing and pulling motions with the right upper extremity and bilateral lower extremities within the aforementioned weight restrictions; frequent pushing and pulling with the left upper extremity (non-dominant); occasionally stooping and climbing ramps or stairs but not ladders, ropes or scaffolds; limited use of right upper extremity (dominant) while walking if using a cane; frequent overhead reaching and front/lateral reaching with the left upper extremity.  Given the above RFC, the Decision found at Step 4 that Ms. Montoya could not perform her past work.  However, at Step 5 the ALJ found that she was not disabled because she was capable of performing other jobs that existed in the national economy, including telephone quotation clerk, semiconductor bonder and order clerk.

---

[1] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404.  The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

The Appeals Council denied Ms. Montoya's request for review of the Decision. Consequently, the Decision is the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011).  Ms. Montoya's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

## II.    Material Facts

The material facts are as follows.

Mr. Montoya was born in 1966 and has a 9th grade education.  Her past jobs included cook, fast food worker, deli clerk and stock clerk.  She suffers from knee, hip, lower back and arm pain, numbness in her arms and legs, as well as depression.

### A.  Medical Treatment

Ms. Montoya had infrequent medical problems until she was involved in a car accident in June 2008.  A day after this accident she reported shoulder pain, lower back pain, and leg numbness.  A contemporaneous MRI of her lumbar spine showed mild bulging disk and subtle increased disk protrusion but no definite signs of nerve root compression at the L4-L5 level, and a slight posterior disk protrusion at the L5-S1 level.  In October 2008, Ms. Montoya received injections in her feet for heel spurs and plantar fasciitis.

In March 2009, she rolled her left ankle and fell on her hands and knees while at work. An emergency department report mentioned Ms. Montoya's complaints of right leg numbness and right side pain that had worsened over the past several days.  The report also mentioned Ms. Montoya's history of lower back pain, but explicitly stated "[n]o new injuries" and contained a diagnosis of chronic back pain.  Percocet and a visit to her primary care physician were recommended.

Ms. Montoya saw Dr. Magnuson on March 31, 2009.  She complained of numbness and weakness in her legs and left arm.  Even when taking Percocet, she was unable to stand or walk more than ten minutes at a time.  An examination showed that Ms. Montoya had normal muscle strength (with some generalized weakness), normal lumbar range of motion, negative straight leg tests and negative Romberg tests, but a limping gait with knee swelling, clicking and tenderness.  She was also unable to walk on her heels, toes or walk heel to toe.

In April 2009, Ms. Montoya intentionally cut her own arm with a utility knife, but the emergency department report that documented this incident stated that Ms. Montoya did not want to harm or kill herself.  That same month, x-rays of Ms. Montoya's lower back and knees were performed.  The lower back x-rays showed a loss of intervertebral disk space height at L4-L5 with vacuum phenomenon.  The x-rays of Ms. Montoya's knees were normal.

Dr. Magnuson again examined Ms. Montoya and noted that she had knee pain and left arm pain but a normal gait and normal muscle strength, reflexes and motor function.  Ms. Montoya was prescribed Voltaren, Naproxen, Neurontin and Flexeril.  Dr. Brown examined Ms. Montoya as well.  Dr. Brown found that Ms. Montoya had positive Tinel's sign in her left hand to her radial tunnel, a left forearm myofascial strain, and decreased range of motion at her left elbow and wrist, but she had normal gait, muscle strength, fine motor and cerebellar function, and reflexes. CT images were negative for Ulnar tunnel syndrome.  Dr. Brown characterized her problems as cumulative trauma from repetitive motion.

During May 2009, Ms. Montoya underwent numerous medical examinations and procedures.  MRI's of her knees showed near full thickness articular cartilage defect at the apex of the patella with early subchondral cyst formation in her left knee and cartilage thinning, evidence of a meniscus tear, edema and effusion in her right knee.  Results from a physical exam

performed by Dr. Phelps included normal alignment, no tenderness, good strength, normal range

of motion, normal stability tests, and negative Lachman's, pivot shift, anterior and posterior

drawer, quadriceps inhibition, apprehension and McMurray's tests.  Ms. Montoya walked with a

normal gait and had normal reflexes.  Dr. Phelps administered injections to both knees.  A lower

back MRI was unremarkable except for desiccation at the L4-L5 level.

In May 2009, Ms. Montoya was also examined and treated by Kevin Percy, a physician's

assistant.  Ms. Montoya described increasing pain (at a level of 8 out of 10) with numbness and

weakness in her lower extremities.  She complained of pain localized in her right upper buttock,

numbness in both her legs and weakness in her left foot.  She also reported numbness in her left

arm with neck and shoulder pain.  She told Mr. Percy that she was limited to walking short

distances with the use of a cane and standing no more than ten minutes.  However, she did not

having any difficulty sitting.  Her medications at the time were Naproxen, Gabapentin,

Cyclobenzaprine and Oxycodone.   On examination, Mr. Percy found that: 1) she had normal

strength and reflexes in her left arm but decreased sensation in her fingertips; 2) her thoracic and

lumbar spine examination was normal, except for pain at the extreme of back extension; 3) she

walked with a left foot drag but was able to raise up on her toes and go back on her heels; 4) she

was unable to single leg raise on the left but could perform this movement on the right; 5) her

motor strength on the left was normal except for 4/5 eversion strength and 4/5 strength in the

extensor halluces longus muscle and tibialis anterior muscle; and 6) her left calf and foot had

some numbness, but she had normal reflexes, negative straight leg raise tests and no pain with

internal rotation of the hips or palpation of the greater trochanters bilaterally.  X-rays showed

mild left convexity through the lumbar spine, no scoliosis, loss of disk space height at L4-L5 and

L5-S1, sclerosis and pain at L4, left lower pelvic obliquity and sclerotic changes in the

acetabulum (right greater than left) but good maintenance of joint space.  Based on these examination findings, Mr. Percy concluded that Ms. Montoya had degenerative disk disease of the lumbar spine, back pain, numbness and pain with left side weakness in her lower extremities, a limp and hip degeneration.

Ms. Montoya returned to Mr. Percy in June 2009.  Upon examination, Mr. Percy noted: 1) left antalgic gait and left lower pelvic tilt; 2) full range of motion in the knees but some mild pain at extremes; 3) internal and external rotation of the hips caused stress against the knee joint and groin pain bilaterally; 4) strength testing was 5/5 in both lower extremities; and 6) the foot drag was no longer present.  Based on this exam and a review of the May 2009 lower back MRI, Mr. Percy concluded that there was little change between the 2008 and 2009 MRIs, and he recommended physical therapy.

During October and November 2009, Ms. Montoya saw Dr. Schwender three times as part of her application for worker's compensation.  On October 6, Dr. Schwender recorded in treatment notes that Ms Montoya had experienced contusions on both knees and elbows, a lumbar strain and a left ankle strain in the slip and fall in March 2009, and that she was unable to work from October 6 to October 20, the date of the next appointment.  Dr. Schwender prescribed Ibuprofen, Norflex and Tromadol and recommended pool therapy at all appointments.  After the third appointment, Dr. Schwender wrote a more comprehensive examination report.  According to his notes, Ms. Montoya's referrals to specialists had been denied by her insurance company. During the examination she was mildly uncomfortable and moved around with minimal to mild difficulty, but she was alert, cooperative and her mood and affect were within normal limits. Although her impairment was undetermined, Dr. Schwender concluded that Ms. Montoya was

not at maximum medical improvement and was unable to work until her next visit, which was set for four weeks later.

According to the record, Ms. Montoya next received medical treatment almost two years later, in October 2011.  She went to the emergency room complaining of numbness in her feet, weakness, intermittent back pain and left hand and forearm pain.  She also stated that, although it was difficult, she was still able to walk.  A physical examination showed that she had normal upper and lower body strength, good sensation except in her feet, no spinal tenderness except in her lumbar spine, normal movement in her extremities, normal grip but some left forearm tenderness.  Blood tests and x-rays of her left hand and pelvis were normal, but x-rays of her lumbar spine showed degenerative disk disease.

Later in October, she returned to the same emergency room with complaints similar to those asserted in her prior visit.  A physical examination did not reveal any neurological deficits but did show she had good bilateral strength.  Percocet was prescribed and a walker was recommended.  No further diagnostic testing was recommended.

### B.  Dr. Borja's Evaluation and Opinion

The only opinion from a treating or examining physician addressing Ms. Montoya's functional impairments was from Dr. Borja.  She examined Ms. Montoya in July 2010 and made the following findings: 1) Ms. Montoya had limited dorsolumbar and hip flexion with pain; 2) she had positive straight leg and McMurray's tests; 3) she experienced left knee and ankle pain with limited flexion; 4) she experienced left lower extremity joint line tenderness and popping; 5) she experienced limited flexion with pain in both shoulders; 6) she had 4/5 strength in the left upper and lower extremities, but 5/5 strength in the right upper and lower extremities; and 7) she had a notable foot drop, spasms, atrophy and giveaway weakness.  Dr. Borja diagnosed Ms.

Montoya with left ankle pain, chronic left knee pain with arthritis from previous injury and left hip pain with foot drop and associated radicular symptoms (left worse than right).  Dr. Borja concluded that Ms. Montoya was able to lift less than ten pounds, stand or walk up to four hours in an eight hour workday with frequent breaks, and sit up to eight hours in an eight hour workday with frequent breaks.  She was limited to bending, squatting, crouching, stooping, reaching, pushing, pulling, grasping, fingering and handling frequently.  She required a cane to walk and her "workplace environmental limitations are heights, stairs and ladders."

### C.  Dr. LoGalbo's Opinion

Dr. LoGalbo, a state medical consultant, reviewed Ms. Montoya's records and completed a RFC form.  According to Dr. LoGalbo, Ms. Montoya was able to: 1) frequently lift and carry ten pounds; 2) stand or walk up to four hours in an eight hour workday; 3) sit more than six hours in an eight hour workday; 4) frequently crawl, occasionally climb ramps and stairs, occasionally stoop, and never climb ladders, ropes or scaffolds.  However, because she had to use a cane to walk, she was unable to use her right (dominant) hand when she walked, but could frequently use her left hand.  When sitting she had unlimited use of her right hand and frequent use of her left hand.

### D.  Dr. Hoffman's Opinion

Dr. Hoffman administered a psychological evaluation in August 2011 and diagnosed Ms. Montoya with major depressive disorder (recurrent, moderate to severe and partially exacerbated by a general medical condition) and rule-out borderline personality disorder.

Dr. Hoffman wrote that Ms. Montoya reported symptoms of depression including anhedonia, low energy, sadness and crying, emotional numbness, isolation, poor self-care, increased irritability, thoughts of suicide and self-harm, and feelings of worthlessness,

helplessness and hopelessness.   During a mental status examination, Ms. Montoya was dramatic (often crying), emotionally labile and avoided answering questions directly.  She had poor abstract thinking as well as concentration and short-term memory problems.  However, her thought and speech organization was tangential but clear and well organized with direction and she had intact judgment and reasoning.

According to Dr. Hoffman, the rule-out borderline personality disorder was not a complete diagnosis.  However, Ms. Montoya did meet some of the symptoms including self-injury behavior, unstable self-image and unstable interpersonal relationships.  Dr. Hoffman recommended further evaluation and testing to confirm Ms. Montoya's borderline personality disorder and cognitive difficulties:

> [Ms. Montoya] did show some cognitive difficulties also, which are likely to be secondary to the depression but could also be secondary to the general medical condition.  The nature of these difficulties are not clear at the current time and further cognitive and memory testing would be needed to clarify any of this information.  However, the combination of these difficulties does suggest that Ms. Montoya may have at least moderate difficulty interacting appropriately with customers, peers and supervisors.  She likely would have mild difficulty learning and carrying out simple work-related tasks, based on her performance on the mental status, and likely have somewhat more severe difficulties with more complex work-related tasks.  However further testing would be needed to clarify this.

Ultimately, Dr. Hoffman concluded that Ms. Montoya had the following work limitations: mild difficulties in her ability to make judgments on simple work-related decision and understanding, remembering and carrying out simple instructions; moderate difficulties in her ability to make judgments on complex work-related decisions and understanding, remembering and carrying out complex instructions; and moderate difficulties interacting with the public, supervisors and coworkers, as well as responding appropriately to usual work situations and changes in a routine work setting.

The ALJ specifically considered Dr. Hoffman's opinions in the Decision.  However, the ALJ divided Dr. Hoffman's opinion into two parts and assigned a different weight to each portion.  The ALJ gave "some weight" to Dr. Hoffman's opinion that Ms. Montoya had "moderate restrictions in the ability to understand and remember complex instructions, the ability to carry out complex instructions and the ability to make judgments on complex work-related decisions."  The ALJ based this finding on the lack of supporting medical evidence, including the lack of a prior diagnosis for depression in the record and no evidence of treatment for a mental impairment.  The ALJ gave "less weight" to Dr. Hoffman's opinion that Ms. Montoya had "moderate restrictions in the ability to interact appropriately with the public, supervisors and co-workers and the ability to respond appropriately to usual work situations and to changes in a routine work setting."  This finding was based on Dr. Hoffman's limited diagnosis of rule-out borderline personality disorder, Ms. Montoya's dramatic behavior and avoidance of direct answers to questions during Dr. Hoffman's examination, as well as her testimony that she had no problems interacting with family, friends, neighbors and others.  In particular, the ALJ wrote that Ms. Montoya sees her adult children every two weeks and her grandchild once every one or two weeks.

**E.  Vocational Expert Testimony**

During the hearing, the vocational expert and Ms. Montoya's attorney engaged in the following dialogue:

> (Ms. Montoya's attorney) Q: Are these – are all three jobs identified requiring lifting ten pounds or more?
> (Vocational Expert) A: No more than ten pounds, Mr. Newell.  They're sedentary.
> Q: And, right, so that – does that mean you have to be able to lift ten pounds.
> A: No.
> Q: What is the – is it the sitting feature, then, of these jobs that allow for the sedentary classification?
> A: A combination.

Q: A combination of lifting and sitting?

A: Yeah.  Yeah, there are light-duty jobs and, as you know, that don't require any lifting, just for an example.

Q: Well, these jobs are going to require some lifting?

A: Yeah, some.

Q: What are –

A: Two of them are clerical, so.

Q: What is – what's the break allowance for working?  How often is somebody allowed to take a break?

A: Ten prior to the meal, the meal, and ten minutes after the meal.

Q: All right.  So if somebody had to take frequent breaks, would that preclude work?

A: How, how frequent?

Q: Frequent.

A: Well, I don't know what that means.  That's more than three?

Q: Well, you're a vocational expert.  Would frequent mean more than ten-minute breaks once a half-a-shift?

A: It could; it could mean.  You're asking the question, though.

Q: If it means a third to two-thirds of the time, it's going to preclude work?

A: Oh, yeah, if you had to take five/six breaks a day, that's not – you're not going to be very productive.

## III.    Issues Presented

Ms. Montoya raises two challenges to the Commissioner's Decision: (1) the ALJ failed to properly determine Ms. Montoya's RFC; and (2) the Commissioner did not meet her burden at Step 5.  In her challenge to the ALJ's RFC finding Ms. Montoya contests the ALJ's assessment of the medical opinions of Dr. Borja, Dr. LoGalbo, Dr. Hoffman and Dr. Schwender.

## IV.    Standard of Review

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); 42 U.S.C. § 405(g).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  On appeal, a reviewing court's job is

neither to "reweigh the evidence nor substitute our judgment for that of the agency."  *Branum v.*

*Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of*

*Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

The ALJ is required to consider the medical opinions in the record, along with the rest of

the relevant evidence. 20 C.F.R. § 404.1527(b).  When evaluating medical opinions, the medical

opinion of an examining physician or psychologist is generally given more weight than the

medical opinion of a source who has not examined the claimant.  The ALJ should evaluate an

examining physician's medical opinion according to the factors outlined in § 404.1527.  Those

applicable to an examining physician include:

1) The degree to which the physician's opinion is supported by relevant evidence;
2) Consistency between the opinion and the record as a whole;
3) Whether or not the physician is a specialist in the area upon which an opinion
   is rendered; and
4) Other factors brought to the ALJ's attention which tend to support or contradict
   the opinion.

§ 404.1527.

Having considered these factors, an ALJ must give good reasons in the decision for the

weight assigned to a medical opinion.  § 404.1527; *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th

Cir. 2007); *Luttrell v. Astrue*, 453 Fed.Appx. 786, 794 (10th Cir. 2011) (unpublished).  "The

[ALJ] must explain… the weight given to the opinions of a State agency medical or

psychological consultant or other program physician, psychologist, or other medical specialist, as

the [ALJ] must do for any opinions from treating sources, nontreating sources, and other

nonexamining sources who do not work for us."  § 404.1527(e)(2)(ii); *see also Watkins v.*

*Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (the ALJ's findings must be sufficiently specific

to make clear to any subsequent reviewers the weight given to a medical opinion and the reasons

for that weight).  The ALJ is not required to explicitly discuss all the factors outlined in

§ 404.1527.  *Oldham*, 509 F.3d at 1258; SSR 06-03p.  However, the ALJ must discuss not just

evidence that supports the decision, but also "uncontroverted evidence he chooses not to rely

upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007,

1010 (10th Cir. 1996) (citation omitted).  "The ALJ is not entitled to pick and choose from a

medical opinion, using only those parts that are favorable to a finding of nondisability."

*Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (citation omitted).

The ALJ cannot substitute a personal medical judgment for that of a physician or

psychologist.  *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996) (*citing Kemp v. Bowen*,

816 F.2d 1469, 1476 (10th Cir. 1987) (ALJ cannot interpose his own medical expertise over that

of a physician)).

"Harmless error analysis 'may be appropriate to supply a missing dispositive finding …

where, based on material the ALJ did at least consider (just not properly), we [the court] could

confidently say that no reasonable administrative fact finder, following the correct analysis,

could have resolved the factual matter in any other way.'"  *Id*. (quoting *Allen v. Barnhart*, 357

F.3d 1140, 1145 (10th Cir. 2004)).

### V.    Discussion

### A. Dr. Borja's Opinion

In the Decision, the ALJ specifically considered Dr. Borja's opinion, doing so in

conjunction with the opinion Dr. LoGalbo, a non-examining consulting physician.  After

summarizing both, the ALJ wrote "these opinions are generally consistent with each other and

with the evidence in the record as a whole."  Ms. Montoya disputes this finding.  She argues that

the limitations outlined in Dr. Borja's opinion are not consistent with Dr. LoGalbo's opinion or

the RFC finding set forth in the Decision. According to Ms. Montoya, the ALJ's failure to explain this inconsistency is error.

The Court begins its analysis by noting that the ALJ did not assign any specific weight to Dr. Borja's opinion. A cursory glance through the Decision reveals that the ALJ cited favorably to this opinion, and both Ms. Montoya and the Commissioner seem to accept that the ALJ gave Dr. Borja's opinion substantial weight.

Dr. Borja described Ms. Montoya's limitations as lifting less than ten pounds, never climbing stairs, and taking frequent breaks from sitting, standing and/or walking. However, Dr. Borja's opinion is not adopted verbatim in the ALJ's RFC finding. That finding limited Ms. Montoya to lifting and carrying less than ten pounds frequently and ten pounds occasionally, occasionally climbing stairs, sitting with normal breaks for eight hours in an eight hour workday, and did not include a requirement for any breaks when limiting her to standing or walking for a total of four hours in an eight hour workday. There are two significant differences between Dr. Borja's assessment and the ALJ's RFC finding – never climbing stairs as compared to occasional stair climbing, and sitting and standing with frequent breaks as compared with sitting for eight hours with normal breaks.

The ALJ was obligated to explain why Dr. Borja's opinion was not adopted. *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) (ALJ required to consider every medical opinion and to provide specific, legitimate reasons for rejecting it); § 404.927(c) (regardless of source, the Commissioner will evaluate every medical opinion received). The failure to do so is error. *See Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the error is not harmless. The frequency of breaks from sitting affects the type of sedentary work Ms. Montoya could perform. According to the vocational expert, a normal work routine included three breaks

in an eight hour day.  In contrast, the need to take five breaks in a day could preclude Ms.

Montoya from performing the jobs the ALJ ultimately found Ms. Montoya could perform at Step

5.  As such, reversal and remand are required.

**B.  Dr. Hoffman's Opinion**

The Court also agrees, in part, with Ms. Montoya's challenge to the weight given Dr.

Hoffman's opinion.  In the Decision, the ALJ bifurcated Dr. Hoffman's opinion, giving "some

weight" to his opinion that Ms. Montoya had moderate difficulties in cognitive functioning, but

giving "lesser weight" his opinion that Ms. Montoya had moderate restrictions in interpersonal

interactions.  Ms. Montoya argues that the ALJ improperly replaced Dr. Hoffman's medical

opinion with a personal judgment.

When weighing a medical opinion of an examining psychologist, the ALJ must give good

reasons for the weight given that opinion.  § 404.1527.  The Court has some concern with regard

to the ALJ's bifurcation of Dr. Hoffman's opinion into two separate opinions for which the ALJ

gave differing credence.  The Decision does not explain on what medical basis the ALJ

distinguished between portions of Dr. Hoffman's opinion.  Thus, it would appear that the ALJ

relied upon a lay distinction between components of Dr. Hoffman's opinion.  This would be

inappropriate.

However, assuming that the opinion properly could be separated into two opinions, the

Decision does not offer sufficient explanation for limited weight given to each by the ALJ. The

ALJ assigned Dr. Hoffman's conclusions about Ms. Montoya's cognitive functioning only

"some weight".  According to the Decision, this was because there was no evidence of treatment

for mental impairments and no evidence that Ms. Montoya's symptoms lasted at least twelve

months from the date of Dr. Hoffman's examination.  A lack of supporting medical evidence can

be a valid reason for giving limited weight to a medical opinion.  § 404.1527(c)(3).  However, it is unclear how the lack of treatment pertains to Dr. Hoffman's assessment of cognitive limitations.  Unless Ms. Montoya's cognitive limitations were treatable, the absence of treatment records would be irrelevant.   And if the cognitive limitations were not treatable, they would be presumed to last longer than a year.  Thus, critical to the ALJ's assessment is whether Ms. Montoya's cognitive limitations were treatable.  Neither the Decision, nor the record addresses this.  As a consequence, the ALJ failed to articulate a sufficient reason for discounting  this opinion.

The second of Dr. Hoffman's opinions concerned limitations in Ms. Montoya's ability to engage in interpersonal interaction.  The ALJ gave three reasons for assigning reduced weight to this opinion - Dr. Hoffman's limited diagnosis of rule-out borderline personality disorder, Ms. Montoya's dramatic behavior and avoidance of direct answers to questions during Dr. Hoffman's examination, and her statements that she had no problems interacting with family, friends, neighbors and others.  None of these reasons are sufficient to reject or reduce the weight given to Dr. Hoffman's opinion.

The first two reasons are drawn from information contained in Dr. Hoffman's medical evaluation.  Essentially, the ALJ made an independent assessment of  Dr. Hoffman's observations, then rejected the conclusions that Dr. Hoffman drew from his evaluation and assessment.  This is a clear and impermissible substitution of the ALJ's personal, lay opinions for that of a medical professional.  *See Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996) (ALJ cannot substitute personal medical judgment for physician's).  The  same is true for ALJ's final justification for discounting  Dr. Hoffman's opinion.  The ALJ rejected Dr. Hoffman's medical opinion  in favor of evidence from lay witnesses about Ms. Montoya's ability

16

to interact with her family.  Although the ALJ may consider evidence from lay sources, such cannot be relied upon in order to contradict a medical opinion.

Again, the error is not harmless.  The ALJ did not include any of Dr. Hoffman's opinion in the Ms. Montoya's RFC.  Presumably this is because the ALJ gave the opinion(s) little weight. Had the ALJ included Dr. Hoffman's assessment of Ms. Montoya's mental restrictions in the RFC, the Vocational Expert's opinion as to what work Ms. Montoya could perform may well have changed.

For the forgoing reasons, the Commissioner of Social Security's decision is **REVERSED** and **REMANDED.**  The Clerk shall enter a Judgment in accordance herewith.

DATED this 16th day of December, 2013.

**BY THE COURT:**

Marcia S. Krieger
United States District Judge